UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

SHALIN JHAVERI,

                     *Defendant.*

5:10-CR-523 (NAM)

---

### SENTENCING MEMORANDUM ON BEHALF OF SHALIN JHAVERI

 

MORVILLO, ABRAMOWITZ, GRAND,
  IASON, ANELLO & BOHRER, P.C.
565 Fifth Avenue
New York, New York 10017
Telephone:  (212) 856-9600
Facsimile:  (212) 856-9494

*Attorneys for Defendant Shalin Jhaveri*

Of Counsel:

    Jodi M. Peikin
    Robert M. Radick
    Candice Aloisi

## INTRODUCTION

On January 20, 2011, this Court will sentence Shalin Jhaveri ("Shalin") based on his guilty plea to a one-count Information charging theft of trade secrets. For the reasons set forth below, we respectfully submit that the time Shalin will already have served by then – 11 months and 19 days, which is very close to the low end of the applicable guidelines range (12 months) set forth in the plea agreement and Presentence Report ("PSR") – is a sentence "sufficient, but not greater than necessary" to achieve the sentencing objectives set forth in 18 U.S.C. § 3553(a).

Shalin is a devoted husband to his wife Richa Dave ("Richa"), a loving and respectful member of his family, a diligent and studious young man, and a nurturing friend who has never before been in trouble with the law. As described below, this crime is a complete departure from the way Shalin has led his life, and he feels profound remorse and regret for his conduct. Unfortunately and regrettably, Shalin has dishonored his loved ones and himself by straying from his core values of hard and honest work, and by trying to take a shortcut to establish a business. For this conduct, Shalin has spent just short of a year in jail, will be deported from the country he has called home for over eight years, has lost his career, has almost certainly destroyed the potential benefit of his rigorous education, and has caused his family great suffering and shame. In light of these and other circumstances discussed herein, we respectfully ask your Honor to sentence Shalin to the time he already has served.

## A SENTENCE OF TIME SERVED IS APPROPRIATE

Among the factors relevant to a court's sentencing determination are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the sentencing range established . . . in the guidelines;" and (3) "the need for the sentence imposed to

1

reflect the seriousness of the offense" and to provide "adequate deterrence." 18 U.S.C. § 3553(a). For the reasons that follow, each of these factors supports a sentence of time served.

### A. Shalin's Conduct in This Case Was Inconsistent with His Otherwise Unblemished History and His Compassionate and Diligent Nature

Shalin knows that he was fortunate to have a loving family, a happy marriage, an exceptional education and career, and the ability to succeed on his own. He also fully understands and appreciates that in making the aberrational and misguided decisions that led to his arrest, he squandered opportunities of which many others could only dream. Shalin makes no excuses for his conduct and takes full responsibility for his actions, but as detailed below, these actions were entirely inconsistent with how he has lived the rest of his life. In fact, apart from his conduct in this case, Shalin's personal history is that of a serious and devoted student, a young man focused on self-improvement and educational achievement, and a compassionate individual who has always sought to give to those less fortunate than himself. Shalin has also been an otherwise honest and law-abiding person, and as many attest, he has been dependable and trustworthy to his friends, and loving, attentive and reliable to his family.

The Jhaveri family is extraordinarily close, and Shalin has long played a crucial role in his family as a mentor and a caretaker. We understand from Shalin's sister Minita that Shalin was a central figure in her upbringing, due to his maturity, caring nature, and unconditional love. Shalin's father has described Shalin as somewhat sheltered and naïve, but at the same time compassionate and sensitive beyond his years. According to Shalin's family, there are countless examples of Shalin's mature and compassionate nature, but one that stands out is when Shalin left his Ph.D studies at Cornell University to return to India to be with his ailing grandparents, spending many nights at their hospital bedsides while they were terminally ill. Similarly, Shalin

provided invaluable love and support to his sister when, in May 2009, Minita suffered a miscarriage and came to the United States with her husband to seek comfort from Shalin.

Shalin's compassionate nature has extended well beyond his family members, and has included friends, neighbors, and even strangers as well. For example, on the night of Shalin's wedding, when many people would be focused solely on themselves and their wedding festivities, Shalin removed himself from his guests and his wife to pack up unused food from the reception and personally deliver it to poor families living in road-side shanties. And, according to his family members and friends, this was not a one-time occurrence, but rather is one small example of Shalin going out of his way to help those less fortunate than himself. In that same spirit, before he moved to the United States, Shalin regularly provided free lessons in math and science to underprivileged children in his Mumbai neighborhood. In fact, Shalin's family has told us that his bedroom was often like a mini-classroom, where one would frequently find groups of children learning. Even after Shalin left India to study in the United States, he continued to help with the education of children. Every year on his birthday, Shalin sends money to his mother for her to donate to a charity in India that is dedicated to educating impoverished children.

We further understand from Shalin's wife Richa that, even after his arrest, when Shalin himself has been struggling mightily, he has continued in his selfless efforts to help others. During his time in custody at the Onondaga County Correctional Facility ("OCCF"), for example, Shalin told his wife Richa to donate most of his possessions to the Salvation Army rather than take them back to India after his release. Shalin also has been writing letters to other inmates before their release, encouraging them to make amends for their crimes and move forward with their lives in a positive direction.

3

In sum, Shalin is and always has been a diligent, devoted, compassionate, and giving person. While he blames no one but himself for the conduct that brings him before the Court, he never before has been in trouble, and his attempt to secure an investor through an illegal shortcut is entirely inconsistent with his nature and the person that he is.

### B. Shalin Has Demonstrated Complete Acceptance of Responsibility for His Crime

As the Court is aware, on November 5, 2010, Shalin waived indictment and pleaded guilty to one count of theft of trade secrets. The charge against Shalin, which he has fully acknowledged and admitted, was based on his illegal downloading of proprietary and confidential BMS documents, and his transmission of three such documents to an undercover government agent who posed as a potential investor in a business that Shalin had come to believe he would establish with Dr. Sarfaraz Niazi. Shalin met Dr. Niazi at a conference in Spain in the fall of 2009, and he too may have been a government agent.

Long before his November 2010 guilty plea, Shalin accepted responsibility for his wrongful acts. Indeed, shortly after his arrest in February 2010, Shalin indicated to the government, through counsel, that he wished to plead guilty, and from March to November 2010, Shalin repeatedly consented to exclusions of Speedy Indictment time while awaiting the plea offer to which he subsequently agreed. Shalin also attempted to rectify the wrong he committed by cooperating fully with the government at all times. When arrested on February 2, 2010, Shalin provided a full confession to the arresting FBI agents, and voluntarily provided the FBI with access to all of his possessions, including his car, his apartment, his computers, and all other electronic devices he owned. Soon after his arrest, the government also expressed an interest in Shalin's cooperation in this matter, and indicated that such cooperation might lead to a motion under U.S.S.G. § 5K1.1. Although the government later advised us that, through no fault of

4

Shalin's, his assistance was no longer sought or requested, Shalin was always willing to cooperate, and directed counsel to convey this willingness in no uncertain terms.

Shalin has also shown acceptance of responsibility by making the extraordinary decision not to post bond and secure his own pretrial release, even after Judge Lowe approved Shalin's bail proposal. Shalin made the decision to remain in pretrial custody and not pursue the bail that was set for him because he was ready to plead guilty from an early point, accepted responsibility for his actions, and wanted to begin the process of making amends for his crime.[1]

### C. Shalin Has Experienced and Will Continue to Experience Severe Collateral Consequences of His Crime

In addition to the nearly 12 months he already has spent in jail, this matter has and will continue to have a tremendously painful and difficult impact on numerous aspects of Shalin's life. The collateral effects of Shalin's conviction, described below, are a proper consideration under § 3553(a) in determining a "just punishment for the offense." *See, e.g., United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009).

First, Shalin's mental health deteriorated swiftly and significantly after his arrest; whereas he was once sharp and focused, he immediately became distraught, distracted, and hopeless. In fact, during his second night of incarceration, Shalin tried to commit suicide several times.[2] Although Shalin has not tried to take his own life since that night, he still experiences

---

[1] The government has suggested that Shalin's decision to remain in jail may not have been voluntary, because the government does not recall the bail proposal being finalized, and because no security was tendered. This suggestion is incorrect. Judge Lowe ruled on March 26, 2010 that the proposed bail package was sufficient to secure Shalin's release, the bond was signed by all of the prospective suretors, and the reason why the property that would have secured the bond has not been posted is because Shalin decided on his own to remain in pretrial detention.

[2] We understand that the facilities at which Shalin has been housed do not have a record of his suicide attempts. Nonetheless, these attempts occurred at the Cayuga County Jail during the nighttime hours of February 3, 2010. Shalin had appeared in court for the first time earlier that day, and upon his return to the jail, a corrections officer told Shalin that he had seen Shalin's

5

anxiety and depression, despite the fact that he is being treated with prescription medication. Moreover, before this matter, Shalin had no history of mental health problems. In fact, Shalin's wife Richa has indicated that she found Shalin's taking of antidepressants in jail especially shocking, as Shalin was always a person who believed that medication should be avoided unless absolutely necessary. Shalin's decision to rely upon medication thus reflects the seriousness of his mental health condition, and as the PSR indicates (at ¶ 61),[3] the psychological consequence of Shalin's incarceration may properly be considered as a mitigating fact.

A second, significant collateral consequence of Shalin's conviction is that, because of his misdeeds, his career prospects have been irreparably damaged and his hard work, many years of schooling, and academic achievements may well go for naught. Indeed, the press attention that Shalin's conviction has received, in both the United States and India,[4] has so tarnished his reputation that he is unlikely to ever again find employment in any field for which his academic achievements would otherwise have made him fully qualified. These types of consequences, as well as the 11 months and 19 days he will have served as of the date of sentencing, not only will deter Shalin from ever committing any further crimes, but also are more than sufficient to deter anyone else with access to trade secrets from engaging in similar illegal acts.

---

case in the news, and even showed Shalin an online story about his arrest. Overwhelmed with shame and despair, Shalin tried to suffocate himself approximately six times by wrapping a bed sheet tightly around his neck and head. His suicide attempts were interrupted when a guard (who apparently did not witness Shalin's actions) came to transfer Shalin to the OCCF. Upon arriving at the OCCF, Shalin did not admit to his suicide attempts because he was deeply ashamed and embarrassed about what he had tried to do.

[3] We have thus far received only the initial version of the PSR, and we have been advised by the Probation Office that the PSR will be amended to reflect certain corrections and clarifications provided by the parties. The paragraph numbering set forth herein is based upon what we understand will be the numbering in the final version of the PSR.

[4] The media attention regarding Shalin's case has included press coverage by American media outlets such as the Post-Standard, Reuters, and CNBC, and by Indian media outlets such as the Times of India, the Economic Times of India, and "Calcutta Tube."

6

Third, as noted above, Shalin has elected to remain in pretrial custody since his arrest so as to begin making amends for his crime. Shalin has spent all but the first two days of this time at the OCCF, where he has been incarcerated not just with other non-violent offenders, but also with a range of defendants, some of whom have lengthy histories of violence and assault. Shalin in fact has been threatened and assaulted on two occasions in the OCCF, and thus has experienced a great deal of worry regarding his own safety, especially at the outset of his incarceration. Furthermore, because Shalin has been suffering from depression and is considered a potential danger to himself, he has been housed in the OCCF's mental health unit, where he is more closely supervised than inmates in the general population. Although he has gradually come to feel more comfortable in this unit, his placement there has meant that Shalin has not had many of the privileges he would have in general housing, such as the same access to outdoor recreation or the same amount of time outside his cell as other inmates are allowed.[5]

Fourth, although Shalin's experience in jail has been difficult because of his mental health and because this is his first experience in the criminal justice system, his guilt over his family's suffering is and will continue to be the source of the greatest pain he has ever known. Shalin's wife and father have each been hospitalized due to the severe stress and depression caused by Shalin's crime. His mother also has been unwell since Shalin's arrest, and has been prescribed anxiety medication to relieve her symptoms. Shalin's sister Minita and her husband

---

[5] Notwithstanding the difficulties Shalin has had in jail, he has been an exemplary inmate, and we have been told by the head counselor at the OCCF, Mr. Lavern Doud, that Shalin has not had even the slightest disciplinary infraction at the jail. Assuming Shalin continues his respectful and cooperative behavior, the 11 months and 19 days he will have served as of the date of sentencing will be nearly the equivalent of a 14 month sentence. Stated differently, were Shalin's sentence in this matter to be set at 14 months, and were he to continue to demonstrate the same exemplary conduct he has shown this far, he would receive 63 days of good-time credit, and a 14 month sentence would be fulfilled by Shalin spending less than 12 months in custody. Since time served is thus the functional equivalent of a 14 month sentence, this further supports the sentence we request.

Aalok are under great emotional distress as well, in part due to the fact that Minita has spent many months away from Aalok and the rest of her family so as to be able to visit Shalin at the OCCF. Further, Shalin's maternal grandfather is dying of Parkinson's disease in India, and although his grandfather desperately wants to see Shalin before he dies, Shalin recognizes that, due to his actions, such a final visit may not be possible. Shouldering the guilt for this family suffering will likely be Shalin's most significant punishment, and while a sentence of time served will not relieve Shalin of this burden, it will at least allow him to begin the process of trying to rebuild his life and the lives of the family members whom he so dearly loves.

### D. Neither the Polygraph Results Nor Shalin's Statements in Recorded Conversations Warrant a Sentence Greater Than Time Served

Two additional factors which the government has raised do not undermine the appropriateness of the sentence we have proposed.

First, one of the conditions of Shalin's plea agreement was that he take a polygraph test so that the government could determine "the quantity, nature and last known location" of the documents Shalin had taken, and whether others "participated in any way" in Shalin's conduct or "received or ha[d] access to" the information he took. *See* Plea Agreement ¶ 1(d). Although we have not yet received the data underlying the polygraph results (despite several requests), we have received an FBI polygraph report, and the report indicates that the test was "inconclusive" as to certain relevant questions, but that there was "deception indicated" as to other virtually identical questions.[6] Shalin maintains that he was truthful during the polygraph, and the fact that

---

[6] Specifically, the report indicates that the question "Do you still possess any of those proprietary documents" produced a polygraph result of "Deception Indicated," but the nearly identical question "Do you still have any of those proprietary documents" produced results that were inconclusive. Similarly, the question "Are you withholding any information regarding anyone else involved in taking any of those proprietary documents" resulted in the finding of "Deception

8

similar questions produced different results seems itself to demonstrate the unreliability of the examination. We further note that the Supreme Court, the Second Circuit, and the Department of Justice all agree that polygraph tests are inherently unreliable, and even the U.S. Attorney's Office for the Northern District of New York has itself argued that polygraph examinations are unreliable and should not be utilized to assess credibility.[7] The polygraph results thus should play no role in the determination of an appropriate sentence in this case.

    Second, in response to our efforts to provide the Probation Office with the full background of the offense, the government has sought the inclusion in the PSR of selected excerpts from a recording that the undercover "investor" made of a conversation with Shalin. The government's apparent purpose in providing these excerpts is to suggest that it had been Shalin's plan to take and use a substantial number of BMS documents whenever he left the company. However, because the undercover apparently taped only a portion of the relevant meeting with Shalin, the recording from which these excerpts were taken did not capture the entirety of Shalin's statements, and other conversations between Shalin, Dr. Niazi and the

---

Indicated," but a largely identical question – "Besides what you told me, was anyone else involved in taking any of those proprietary documents" – produced inconclusive results.

[7] *See, e.g.*, *United States v. Scheffer*, 523 U.S. 303, 312 (1998) ("[T]here is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams."); *United States v. Messina*, 131 F.3d 36, 42 (2d Cir. 1997) (referring to the Second Circuit's "traditional rule against the admission of polygraph evidence"); DOJ Criminal Resource Manual § 259 (agreeing that, "[i]n light of present scientific evidence . . . [t]he polygraph machine is not a 'lie detector,' nor does the operator who interprets the graphs detect 'lies.' The machine records physical responses which may or may not be connected with an emotional reaction – and that reaction may or may not be related to guilt or innocence.") (internal quotation marks omitted); *see also* Gov't Mem. of Law, *United States v. O'Conner*, 3:08-CR-77 (TJM) (filed Mar. 26, 2008, N.D.N.Y., docket no. 24), Ex. 3, at 6 ("Polygraph opinions are routinely ruled inadmissible and rejected as evidence because they have been determined to be unreliable and not based upon any scientific standards which could assure accuracy, consistency [sic] and prevent fraud, error or mistakes. The fact of the matter is that a polygraph examiners [sic] opinion is nothing more than their subjective opinion which cannot be tested, verified, or subjected to any form of reliable scientific standards. It is their personal and subjective opinion as to whether someone is telling the truth.")

undercover went unrecorded in their entirety. Further, based on a fair assessment of the circumstances and the recordings that do exist, Shalin's statements are more accurately understood as a misguided attempt to tout the importance of the documents he had taken, and to thereby entice the undercover to invest in the business venture that Dr. Niazi had proposed. In fact, as the PSR reflects (see ¶ 13), it was Dr. Niazi who first proposed that Shalin take confidential documents from BMS, and we understand that Dr. Niazi in fact had encouraged Shalin to recruit the undercover investor by stressing the value of the documents in question.

As we have noted throughout this submission, the decision to take and use BMS documents in this way was entirely illegal, and having already acknowledged his guilt and apologized for his actions, Shalin in no way denies the wrongfulness of his conduct. Nonetheless, the excerpts quoted by the government are just that, and the portion of the story they reflect does not warrant a sentence greater than that which we have proposed.

## CONCLUSION

For the reasons set forth above, we respectfully request the imposition of a sentence of a time served.

Dated: January 5, 2011
      New York, New York

Respectfully submitted,

MORVILLO, ABRAMOWITZ, GRAND,
IASON, ANELLO & BOHRER, P.C.

By: _____
Jodi M. Peikin
Robert M. Radick
Candice Aloisi
565 Fifth Avenue
New York, NY 10017
*Attorneys for Defendant Shalin Jhaveri*

10