UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SHALIN JHAVERI,<br><br>　　　　　　　　　*Defendant.* | 5:10-CR-523 (NAM) |

## RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM
## ON BEHALF OF SHALIN JHAVERI

MORVILLO, ABRAMOWITZ, GRAND,
　IASON, ANELLO & BOHRER, P.C.
565 Fifth Avenue
New York, New York 10017
Telephone:  (212) 856-9600
Facsimile:　(212) 856-9494

*Attorneys for Defendant Shalin Jhaveri*

Of Counsel:

　Jodi M. Peikin
　Robert M. Radick
　Candice Aloisi

In its sentencing memorandum, the government argues that, due to the "nature and circumstances of this offense, the seriousness of the offense, and the need for deterrence," Gov't Mem. at 1, the Court should impose a sentence at the upper level of the applicable 12-18 month guidelines range. We write to respond to certain of the government's points, and to further explain why, despite the government's arguments, a sentence of time served is "sufficient, but not greater than necessary" to achieve the objectives set forth in 18 U.S.C. § 3553(a).

First, we note that in describing the nature and circumstances of the offense, the government omits certain important facts. As we indicated in our sentencing memorandum, Shalin takes full responsibility for his crime. Nonetheless, the government's description of the offense leaves out all mention of Dr. Sarfaraz Niazi, who, as part of a potential joint business venture, first proposed that Shalin obtain a capital contribution from the "investor" Samir Qureshi by providing Qureshi with confidential BMS documents.[1] Moreover, despite the government's reference to statements in which Shalin said that he would not have left BMS without taking the documents in question, as we explained in our sentencing memorandum, those statements are better understood as an effort on Shalin's part to tout the value of BMS documents and secure the investor's financial contribution. In any event, the fact is that Shalin did not make the gravely misguided decision to steal and otherwise misappropriate BMS documents until after he met Dr. Niazi. Again, the Court should have no doubt that Shalin accepts full responsibility for the terrible decisions he made, and the complete explanation of the circumstances underlying

---

[1] The government even writes Dr. Niazi completely out of the story when it states that Shalin "flew to meet with this investor in Chicago." Gov't Mem. at 8. To the contrary, as the PSR explains at paragraph 13 (and as the government has not disputed), Shalin visited Chicago not for the purpose of meeting Samir Qureshi, but rather to see Dr. Niazi, visit a biotech facility that Dr. Niazi had indicated he owned, and discuss the specific business venture Dr. Niazi had proposed. It was only after Shalin was already in Chicago that Dr. Niazi arranged the meeting with Qureshi that then occurred.

1

Shalin's conduct (which is set forth in Paragraph 13 of the PSR) does not change the fact that Shalin himself committed a serious criminal offense. But there is considerably more context and nuance here, and that context is relevant to the sentence to be imposed.

Second, the government emphasizes in its sentencing memorandum that Shalin "clearly knew what he was doing was wrong" at the time he was doing it, and suggests that this, too, is an aggravating fact requiring a sentence near the top end of the range. Gov't Mem. at 7. Again, Shalin does not dispute that he knew that what he was doing was wrong, and he has expressed his profound remorse for his actions. However, the fact that Shalin knew of the wrongfulness of his conduct should not be considered an aggravating fact because it is already a necessary element of the crime. In particular, the theft-of-trade-secrets statute requires that a defendant who converted trade secrets did so "intending or knowing that the offense will, injure [the] owner of that trade secret." 18 U.S.C. § 1832(a). Knowledge of wrongdoing is thus necessarily common to every defendant who is guilty of this crime, and such knowledge does not differentiate Shalin's conduct from that of other similarly situated defendants nor justify a sentence at the top of the guidelines range.

Third, the government cites the need for the Court's sentence to provide general deterrence. However, the government provides no reason why a sentence at the upper levels of the guidelines range – as opposed to the approximately 12 months of incarceration that Shalin will have served by the date of sentencing, which due to good time credit is the functional equivalent of a sentence of approximately 14 months (and which will be further increased by the as-yet unknown amount of time Shalin will spend in immigration detention while awaiting removal) – is the only sentence that would achieve the desired deterrent effect. The government also fails to explain why the significant media attention Shalin's arrest and conviction have

2

received, coupled with the many severe collateral consequences present in his case, would fail to deter those with access to trade secrets from engaging in a similar crime. As we explained in our sentencing memorandum, these collateral consequences include, among other things, the irreparable damage to Shalin's career and reputation, the loss of potential benefit from his rigorous and lengthy education, the tremendous emotional and physical suffering of his family, and his own shame and psychological deterioration.

Fourth, the government points to selected excerpts of Shalin's recorded statements as aggravating factors in the offense. However, the government overlooks other relevant recorded statements that should also be taken into account. For example, during the course of the January 23, 2010 dinner conversation that the government frequently cites, Shalin states, "I am not going to make the product that they [BMS] are making." Dinner Recording, January 23, 2010, Track 1, at 1:49-1:54. Shalin repeated at least once more during the dinner meeting, and again during the meeting that Qureshi secretly recorded in a Syracuse hotel room, that he did not intend to make the same products as BMS, and at no point in its submissions has the government disputed the accuracy of Shalin's statements in this regard. Shalin of course recognizes and admits that the documents he took from BMS as part of an illegal shortcut to securing an investment were trade secrets, that they related to certain proprietary BMS processes and procedures, and that they were documents that neither Shalin nor any company outsiders had the right to appropriate for personal use. Nonetheless, the particular type of trade-secret theft at issue here is notably different from the most egregious versions of the offense, in which a corporate insider steals trade secrets for the purpose of selling them to a competitor or setting up a competing company of his or her own. Those, we submit, are the sorts of trade-secret offenses that might warrant a sentence at the upper end of the applicable guidelines range, and while neither we nor Shalin

3

intend in any way to minimize the nature of his illegal acts, consideration of the various ways in which defendants might violate the trade-secret statute provides important context for assessing the severity of the crime that Shalin in fact committed.

Fifth and last, although the government quotes Shalin's statement to the investor that he had "already transferred all of the SOPs" before they met, this issue merits clarification. It is true that by the time Shalin met Samir Qureshi, Shalin had already transferred approximately 1,300 SOPs from the BMS network to his company-issued laptop. However, as we have pointed out to the Probation Office in a letter responding to the PSR, Shalin originally transferred these SOPs to his company laptop not as a prelude to this crime, but rather in connection with a project that he was assigned during his rotation in the BMS Biologics Quality Department. Specifically, Shalin was asked to analyze and make written recommendations regarding the optimal frequency of water purity testing at numerous "water for injection" ("WFI") ports located throughout two buildings (later limited to one building only) at the company's East Syracuse facility. (Water for injection ports are sources of water within the facility that are used for various purposes, including manufacturing, cleaning, etc.) The appropriate frequency of water purity testing depends on the use of the water at each WFI port, so Shalin had to research the various uses of the water at each port, as well as other related issues, in order to generate his written report.

To determine the water uses at each port, and thereby make his recommendations, Shalin relied on various sources of information within BMS, including SOPs which referred to and discussed specific WFI ports around the East Syracuse facility. Because the project was highly complex and had a relatively tight deadline, and because Shalin was unfamiliar with many of the ports he needed to analyze, Shalin spent evenings and weekends working at home, on his BMS laptop, reviewing SOPs and drafting his report. Further, Shalin did not know which of the 1,300

4

SOPs he would need to review in order to complete the project, and he therefore copied all of the SOPs to his work laptop so that he could to access them while working at home. In or about August or September 2009, Shalin completed and submitted an initial draft report in connection with this WFI project. Subsequently, in the course of committing the crime to which he has pleaded guilty, Shalin transferred those SOPs off of his work laptop and emailed certain of them to the purported investor, but the quotes in the government's brief should not be read to suggest that Shalin used BMS documents for any improper purpose prior to meeting Dr. Niazi and the undercover investor in late January 2010.

## CONCLUSION

For the reasons set forth above and in our initial sentencing memorandum, we submit that a sentence of the approximately one year that Shalin will have served by his sentencing date is "sufficient, but not greater than necessary" to achieve the aims of sentencing in this case.

Dated: January 10, 2011
      New York, New York

Respectfully submitted,

MORVILLO, ABRAMOWITZ, GRAND,
IASON, ANELLO & BOHRER, P.C.

By: _____
Jodi M. Peikin
Robert M. Radick
Candice Aloisi
565 Fifth Avenue
New York, NY 10017
*Attorneys for Defendant Shalin Jhaveri*

5